UNITED STATES of America,
Plaintiff–Appellee,

v.

Abdul–Aziz Rashid MUHAMMAD,
Defendant–Appellant.

No. 90–5701.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 2, 1991.

Decided Oct. 30, 1991.

James E. Arehart, Asst. U.S. Atty. (briefed), Lexington, Ky., Frederick A. Stine, V, Asst. U.S. Atty. (argued), Covington, Ky., for plaintiff-appellee.

Deanna L. Dennison (argued and briefed), Covington, Ky., for defendant-appellant.

Before KENNEDY and JONES, Circuit Judges, and HARVEY, Senior District Judge.*

NATHANIEL R. JONES, Circuit Judge.

Defendant Abdul–Aziz Rashid Muhammad (a.k.a. William Anthony Brown) appeals his conviction and sentence for armed bank robbery, use of a firearm during the commission of a felony, possession of a firearm and conspiracy. For the reasons that follow, we affirm.

## I.

At about 3:00 p.m. on June 23, 1989, Muhammad and his co-defendant Stacey Walton, entered the Florence Deposit Bank wearing gloves and ski masks and robbed the bank at gun point. Walton acted as a look-out while Muhammad attended to the cash. Armed with a semi-automatic weapon, Muhammad told the vice-president of the bank to get the money or he would kill him and take hostages. During this exchange Muhammad fired a shot at a customer who was also in the vice-president's office, attempting to kill him. Muhammad later gained access to the vault and robbed the teller stations. He left the bank with $227,582.02. Muhammad and Walton then proceeded to a stolen van to make their get-away.

Meanwhile, as the robbery was taking place, one of the bank employees activated an alarm and the police arrived on the scene. As the van pulled away, Muhammad fired shots at the police officers. The police returned fire. Eventually, the van crashed into a wall and Muhammad, Walton and a third person jumped out of the van, fired at the officers and took off running. Walton, who had been shot, was apprehended shortly thereafter at a nearby shop. The unknown third person was detained by an Officer Damean Stanton of the Florence, Kentucky police department. While Stanton held the suspect at gunpoint, Muhammad came up behind him and stuck a semi-automatic weapon in the officer's back. Fearing that he would be shot, Stanton turned quickly and knocked the gun from Muhammad's hands. A struggle ensued in which Muhammad tried to get control of Stanton's gun. Two shots were fired during the struggle and eventually Stanton was assisted by Officer Horton. The officers managed to subdue and arrest Muhammad, but the third suspect escaped.

During the struggle with Muhammad, Officer Stanton was repeatedly kicked and beaten in the face and on his body. He sustained a number of abrasions on his arms and legs, and was taken to a nearby hospital after the arrest for some x-rays. The x-rays revealed no trauma to his shoulder, which apparently had been hyper-extended during the fight. However, Stanton testified that he was sore and stiff for two weeks afterward with pain in his knees and elbow.

After his arrest, and being advised of his *Miranda* rights, Muhammad admitted to the robbery, to shooting outside the bank, and to wrestling with Officer Stanton over his gun. An Officer Snow also testified that shortly after Muhammad's arrest,

* The Honorable James Harvey, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

when Muhammad was asked why he did not kill Officer Stanton, he replied that "he did not want to draw attention to where he was at the time" and that "if he had to do it over again, he would have shot him." J.App. at 221.

Muhammad was taken into custody by the Florence Police Department for robbery and attempted murder and was so charged in the Boone District Court on June 24, 1989. Muhammad was held at the Boone County Jail, which is authorized to house federal prisoners. On June 30, a Federal Complaint and Arrest Warrant was executed on Muhammad charging him with armed bank robbery and using a gun in the commission of a robbery. On the same day, Muhammad had his initial hearing and was ordered detained pending a bail and detention hearing. The hearing was set for July 6, 1989. On July 3, pursuant to a state court-ordered writ, local authorities took Muhammad from Boone County Jail to a preliminary hearing in state court on the pending state charges. At that time, the state proceedings were stayed pending the disposition of the federal proceedings. After a few hours, Muhammad was returned to the Boone County Jail.

On July 6, 1989, Muhammad had his preliminary hearing in federal court. At that time, apparently in light of the state writ, the United States advised the court that it understood that Muhammad was still in state custody and moved the court to issue a writ to have him produced. The court ordered the writ to issue, and Muhammad was ordered held without bail.

On July 12, the government, in a four-count indictment, charged Muhammad with conspiracy to commit armed bank robbery and use of firearms during the commission of a felony in violation of 18 U.S.C. § 371; armed bank robbery in violation of 18 U.S.C. § 2113(a) & (d) and 18 U.S.C. § 2(a) & (b); armed bank robbery by knowingly using and carrying firearms in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 2(a) & (b); and possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 2(a) & (b). He was arraigned on July 21, and trial was set

for September 18. On September 11, the case was continued on motion from co-defendant Walton until October 30.

On October 10, 1989, for the first time, Muhammad filed a motion to dismiss for lack of jurisdiction. The basis for this motion was that he had been illegally taken from "federal custody" to state court without the appropriate writ. His contention was that in permitting Kentucky state officials to take Muhammad from federal custody, the United States lost jurisdiction over Muhammad. The motion was heard and overruled on October 20. Muhammad renewed his motion on the first day of trial claiming this time that after the *state* took Muhammad for arraignment, the United States never got a writ to "secure him back into federal custody." J.App. at 105. The district court once again overruled the motion and proceeded with trial.

Muhammad was convicted on all counts. A presentence report was prepared, various objections were made by the defendant, and a hearing was held on the objections. The Magistrate issued his report and recommendation overruling the objections. A sentencing hearing was held on April 26, 1990, at which the district court adopted the report of the magistrate. No further objections were made at that time. Muhammad was sentenced to 327 months imprisonment plus a consecutive 20-year mandatory sentence to run consecutively, a special assessment of $200.00 and a 5-year term of supervised release. This timely appeal followed.

## II.

Muhammad first contends that the district court erred in failing to dismiss the indictment against him for lack of jurisdiction because a writ of habeas corpus ad prosequendum was never executed by the United States. When Muhammad first made his motion to dismiss on October 10, 1989, he alleged that he was a *federal prisoner* who was removed from *federal custody* by the *state of Kentucky* without the appropriate writ. He claimed that under the Interstate Agreement on Detainer Act ("IADA"), 18 U.S.C.App., the United

States lost jurisdiction by releasing him to state custody. Later, on the first day of trial, Muhammad altered his contention, claiming that the problem was that since a federal writ of habeas corpus ad prosequendum was ordered by the federal court but never executed, the court lacked jurisdiction over his person. His claim at this point was that the *federal* government had never had jurisdiction over his person because it had never filed a writ of habeas corpus ad prosequendum for his release from *state* custody. In his brief before this court, Muhammad adheres to his second position, which summarily stated, is that the United States never had jurisdiction over him because he remained in *state* custody absent a writ for his release into federal custody.

■ As a preliminary matter, Muhammad's reliance on the IADA is misplaced. It is clearly established that "the Interstate Agreement on Detainers does not apply to a person who is imprisoned awaiting disposition of pending charges and who has not been sentenced to a term of imprisonment." *United States v. Roberts*, 548 F.2d 665, 671 (6th Cir.), *cert. denied*, 431 U.S. 931, 97 S.Ct. 2636, 53 L.Ed.2d 246 (1977). In the instant case, the state charges against Muhammad were stayed pending the outcome of the federal proceedings, and he had not been sentenced by either sovereign. Therefore, the IADA does not apply.

■ The question that remains, however, is whether the fact that a writ of habeas corpus ad prosequendum was ordered but never issued by the district court deprived the court of jurisdiction. Muhammad was first arrested by state authorities and charged under state law on the 23 and 24 of June, 1989. He therefore was in state custody. On June 30, 1989, a federal complaint was executed, and Muhammad was ordered detained pending a detention hearing. At the detention hearing the United States moved the court for the issuance of a writ of habeas corpus ad prosequendum, apparently believing that Muhammad was still in state custody. Although the court ordered that the writ be issued, that order

was never complied with, and the writ was never formally issued. Thus, the narrow question presented is whether the district court's failure to issue the physical writ requires dismissal of the indictment for lack of federal jurisdiction.

We have found no case which directly addresses the narrow question presented here. Muhammad cites *Rose v. United States*, 365 F.Supp. 841 (N.D.Ill.1973) for the proposition that issuing a writ of habeas corpus ad prosequendum is the "correct way" of bringing a prisoner to trial from the custody of another jurisdiction. Further, in *Carbo v. United States*, 364 U.S. 611, 615, 81 S.Ct. 338, 340, 5 L.Ed.2d 329 (1961), the Supreme Court noted that "the writ *ad prosequendum* was necessary to remove a prisoner in order to prosecute him in the *proper jurisdiction* wherein the offense was committed." The question here, however, is whether the court's oral ruling ordering the writ to issue is sufficient to confer jurisdiction.

The United States argues that we should find that Muhammad was a federal prisoner because he was in federal custody from the time the federal complaint was executed on June 30, 1989. This seems incongruous, however, with the position taken by the United States at the July 6 detention hearing, at which the government petitioned the court to issue a writ because Muhammad was still in state custody.

We find the better position is to treat the failure to issue the physical writ under a Fed.R.Crim.P. 52(a) harmless error analysis. In this case, Muhammad originally took the position that he was a federal prisoner who had been unlawfully taken from federal custody to state court to answer state charges. Later, he argued that he was a state prisoner all along, and that the federal government had no jurisdiction to prosecute him. Muhammad was present before the court on July 6, 1989, however, when the United States asked the court to issue a writ ad prosequendum to release Muhammad from state custody, as was his counsel. In response to the motion by the United States, the magistrate responded, "All right. Let the writ issue then." No

objection was made at this time. Thus, Muhammad was notified that he was before the court in federal custody. The fact that the actual physical writ did not issue did not prejudice the defendant's prosecution in any way. His trial was not delayed in federal court, and his prosecution in Kentucky had been already stayed pending the outcome of the federal proceedings. Thus, as far as the defendant was concerned, he was properly before the federal court. We hold, therefore, that in this particular case the oral ruling of the court as to the issuance of the writ was sufficient to confer jurisdiction on the district court and any failure to issue the physical writ to the state of Kentucky authorities was harmless absent a showing of prejudice affecting substantial rights of the defendant.

### III.

Muhammad next contends that the admission of Officer's Snow's testimony as to a statement allegedly made by Muhammad regarding why he did not kill Officer Stanton was error because the statement was not disclosed to the defendant pursuant to his discovery request under Fed.R.Crim.P. 16. Rule 16 provides in relevant part:

(a) Disclosure of Evidence by the Government.

(1) Information Subject to Disclosure.

(A) Statement of Defendant. Upon request of a defendant the government shall permit the defendant to inspect and copy ... the substance of any oral statement which the government intends to offer in evidence at trial made by the defendant whether before or after arrest in response to interrogation by any person then known to the defendant to be a government agent[.]

\* \* \* \* \* \*

(d) Regulation of Discovery.

\* \* \* \* \* \*

(2) Failure to Comply With a Request. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with the rule, the court *may* order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it *may* enter such other order as it deems just under the circumstances.

Fed.R.Crim.P. 16 (emphasis added). We review a district court's treatment of a failure to disclose a statement to the defendant under Fed.R.Crim.P. 16 for abuse of discretion. *United States v. Glover*, 846 F.2d 339, 342 (6th Cir.), *cert. denied*, 488 U.S. 982, 109 S.Ct. 533, 102 L.Ed.2d 565 (1988).

Muhammad correctly asserts that the government did not apprise him of the statement testified to by Officer Snow. However, just prior to offering the statement in question, Officer Stanton testified as to the struggle that took place between himself and Muhammad. On cross-examination, defense counsel sought to establish various theories as to why Officer Stanton was mistaken. Among these were an attempt to show that the gun was already lying on the ground when Muhammad confronted Stanton; that even if Muhammad had the gun, he did not use it; and that Stanton had mixed up Muhammad with another suspect wearing different clothes. During the recess after this testimony, Officer Snow apprised the government for the first time about the statement in question and the United States immediately apprised the defendant. Before Officer Snow testified, Muhammad's counsel objected to the government's use of Muhammad's statement to Officer Snow and approached the bench. He then made his objection based upon a failure to comply with a Rule 16 discovery request. Based upon representations by the United States that it had just learned of the statement, the court ruled that there was no Rule 16 violation. The testimony was then admitted.

It is well-settled in this circuit that the appropriate sanction, if any, for a failure to comply with Rule 16 is left to the "sound discretion of the trial court." *Glover*, 846 F.2d at 342. In *United States v. Bartle*, 835 F.2d 646 (6th Cir.1987), *cert. denied*, 485 U.S. 969, 108 S.Ct. 1245, 99

L.Ed.2d 443 (1988), the government failed to provide the defendant with highly probative evidence pursuant to a Rule 16 discovery request. The defendant objected to the admission of the evidence, but failed to request a recess or continuance. The district court allowed the evidence to be admitted and on appeal the defendant claimed the trial court abused its discretion. This court disagreed:

> Excluding a critical piece of documentary evidence when a recess or continuance would have adequately protected the defendant's legitimate interests is particularly inappropriate where, as here, the government neither willfully nor negligently violated the discovery order.

*Bartle*, 835 F.2d at 650.

In the instant case, Muhammad does not contend that there was any impropriety or willfulness on the part of the government. Rather, he suggests that the government was "careless" in not learning sooner of the statement and disclosing it. Following *Bartle*, we find that absent a showing of some impropriety or willfulness by the government, it was within the district court's discretion to admit Muhammad's statement to Officer Snow.

■ Muhammad further asserts for the first time on appeal that the statement should have been excluded as it was "inflammatory and prejudicial." However, in its colloquy with the court regarding the statement, defense counsel never raised any objection based upon the prejudicial nature of the statement. The only objection made was as regards late discovery under Rule 16. Therefore, any objection as to the prejudicial nature of the statement has been waived.

In sum, we find that the district court did not abuse its discretion in admitting the testimony of Officer Snow regarding Muhammad's statement.

## IV.

■ Muhammad also contends that the district court made several errors in calculating his sentence. We review de novo a district court's application of the Sentencing Guidelines whenever such application involves mixed questions of law and fact. *United States v. Davis*, 922 F.2d 1385, 1387 (9th Cir.1991). A district court's determinations as to questions of fact in connection with sentencing are reviewed under a clearly erroneous standard. *Id.* at 1387–88; *see also United States v. Barrett*, 890 F.2d 855, 867 (6th Cir.1989).

### A. U.S.S.G. § 2B3.1(b)(3)

■ Muhammad first asserts that the district court erred by raising his base offense level two levels under U.S.S.G. § 2B3.1(b)(3). Section 2B3.1(b)(3) provides a schedule of adjustments to the base offense level for robbery when a victim sustains bodily injury:

> (3) If any victim sustained bodily injury, increase the offense level according to the seriousness of the injury:

| Degree of Bodily Injury | Increase in Level |
|---|---|
| (A) Bodily Injury | add 2 |
| (B) Serious Bodily Injury | add 4 |
| (C) Permanent or Life-threatening Injury | add 6. |

U.S.S.G. § 2B3.1(b)(3) (1991). The presentence report addresses this issue as follows:

> 20. Pursuant to 2B1.3(b)(3), if any victim sustained bodily injury, increase the offense level according to the seriousness of the injury. Pursuant to Subsection (A) of this offense characteristic, the police officer with which [Muhammad] struggled, received bodily injury. He was taken to the hospital and his shoulder was x-rayed as the result of a hyperextension injury received during the struggle. The purpose of the x-ray was to determine if there had been any rotator cuff damage. Therefore, the offense level should be increased two levels.

Presentence Report at 13.

Muhammad attacks this two level increase on two grounds. First he argues that Officer Stanton was not a "victim" under 2B3.1(b)(3). Second, he claims that Officer Stanton did not sustain injuries which would trigger the application of this enhancement.

Muhammad argues that the Officer Stanton was not a "victim" within the meaning of § 2B3.1(b)(3). Muhammad's argument essentially boils down to an assertion that the use of the term "victim" in § 2B3.1(b)(3) was meant to refer only to the victim of the crime of robbery, in this case the bank. He concedes, however, that such a notion of victim would have to include employees and customers present during the offense. This is true because it would make no sense to provide for an increase of two levels for "bodily injury" to the institution of the bank itself. Thus, Muhammad's distinction between the bank and its employees and customers, on the one hand, and Officer Stanton, on the other, is a temporal one. As Muhammad puts it, "The robbery was completed upon leaving the bank and carrying the monies that were not lawfully the property of the defendants." Appellant's Brief at 17.

We find that such a time constrained reading artificially circumscribes the crime of robbery and the meaning of victim for § 2B3.1(b)(3) purposes. As the crime of bank robbery cannot be completed without some form of flight or attempted flight, the crime is more naturally understood to include the act of fleeing and the immediate consequences of such flight. Thus, we find the language "any victim" in § 2B3.1(b)(3) was meant to include any employee, bystander, customer, or police officer who gets assaulted during the bank robbery or during an attempted get-away. *See United States v. Bates,* 896 F.2d 912, 914 (5th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 3227, 110 L.Ed.2d 673 (1990) (approves an

upward departure based upon terror and mayhem caused by defendants fleeing from a bank robbery).[1]

Muhammad also challenges his sentence under § 2B3.1(b)(3) based upon his charge that Officer Stanton was not sufficiently "injured" to invoke the enhancement. The Commentary to § 1B1.1, Application Note (1)(b), defines "bodily injury" as follows:

"Bodily injury" means any significant injury; e.g., an injury that is painful and obvious, or is the type for which medical attention might be sought[.]

U.S.S.G. § 1B1.1, Commentary, Application Note (1)(b). The court found that Officer Stanton was beaten and kicked, resulting in numerous abrasions, the hyperextension of his shoulder, and soreness in his knees and elbow for two weeks. Based upon these facts, the district court's finding is not clearly erroneous.

*B. U.S.S.G. § 3A1.2*

Muhammad also challenges the court's three-level increase in his offense level under § 3A1.2 for "official victim." In the presentence report, the probation office suggested the following:

22. Victim Related Adjustment: Pursuant to Guideline 3A1.2 official victim, if the victim was a law enforcement or corrections officer, or any other official as defined by 18 U.S.C. 1114, or a member of the immediate family thereof, and the crime was motivated by such status, increased [sic] by three levels. As the defendants attempted to escape from the

---

**1.** Muhammad cites *United States v. Graves,* 908 F.2d 528 (9th Cir.1990) for the proposition that the term "victim" as used in U.S.S.G. § 2A2.2(b)(3)(A) was meant to refer only to the victim of the aggravated assault of which the defendant was convicted. In *Graves,* a two level increase was assessed for bodily injury to an officer that the defendant hit with his car while fleeing from the assault on another officer. The Ninth Circuit reversed finding that the normal reading of the term "victim" was meant to apply only to the direct victim of the offense charged. The court reasoned that the use of the term "victim" throughout chapter 2 of the guidelines supports this view. The court cited for example, § 2A3.1 which provides an increase of 4 levels if the "victim" of a sexual assault is under

12 years of age. The court reasoned that no increase could be had if a defendant fleeing from a sexual assault hit a child under 12 with a car. We find the court's analogy inapt. Section 2B3.1(b)(3) specifically provides for an increase for bodily injury to "any victim." The sexual assault provision cited by the Ninth Circuit does not. Further, one must understand the term "victim" in the context of the crime committed. In the context of an assault, the victim might be most reasonably understood to be the person harmed by the assault. While in the context of bank robbery, the scope of the term might be more reasonably understood to include not only the institution of the bank but those persons which are affected by the commission of the crime, including persons harmed in flight.

bank, the defendant fired at least three shots, two of which were directed at police officers. As their flight attempt continued, he became involved in a hand-to-hand combat situation with a Florence, Kentucky police officer as they struggled for possession of the officer's handgun. The officer was injured[.] This action was taken by the defendant because of the police officer's position as a law enforcement officer. No calculation for this has been made in the guidelines calculation process to this point, and therefore, the offense level should be increased three levels.

Presentence Report at 14. U.S.S.G. § 3A1.2 provides:

If the victim was any law-enforcement officer or corrections officer, any other official as defined in 18 U.S.C. 1114, or a member of the immediate family thereof, and the crime was motivated by such status, increase by three levels.[2]

On appeal, Muhammad asserts that the court's three-level increase for official victim is in error because the crime for which he was convicted, bank robbery, was not "motivated" by Officer's Stanton's "status" as a police officer.

Under the version of § 3A1.2 in effect at the time of the offense, the key language was, "If the victim was any law enforcement ... officer ... and the crime was motivated by such status [then] increase by 3 levels." U.S.S.G. § 3A1.2 (before November 1, 1989). Muhammad argues that "the crime" in this context should be understood to be the "offense of conviction." Because his crime was bank robbery rather than assault of a police officer, he maintains that it could not have been motivated

by Officer Stanton's status as an officer as required by the guideline.

The United States argues that the word "crime" in the original guideline could reasonably be read to include any crime related to the offense of conviction, and not merely that offense itself. Since Muhammad's attack of Officer Stanton was motivated by his status as an officer and was related to freeing his co-conspirator in the bank robbery from Officer Stanton's custody, this conduct would fall within the meaning of "crime" in the guideline. Further, the government argues that the amendments to § 3A1.2 "clarified" that the original language was meant to include circumstances where the "offense of conviction" was motivated by an officer's status, *and* when an officer is assaulted while the defendant is fleeing from another offense. *See* U.S.S.G. § 3A1.2 (effective November 1, 1989).

■ We find that the pre-November 1, 1989 version of § 3A1.2 was meant to apply to circumstances such as the one before us in which the defendant assaults a police officer while fleeing from the commission of another crime. That version of § 3A1.2 stated explicitly that it applied to official victims assaulted during flight from another crime. In describing the November 1, 1989 amendment to § 3A1.2, the Sentencing Commission states as follows: "The purpose of this amendment is to *set forth more clearly* the categories of cases to which this adjustment is intended to apply." U.S.S.G. Appendix C, amendment 247 (1991) (emphasis added). We find it significant that the Sentencing Commission did not suggest that it was changing the original intent of the guideline. Rather, the Commission claimed to be clarifying the

**2.** This was the text of the guideline on the date of the offense and the indictment. On the day that Muhammad was convicted by the jury, November 1, 1989, § 3A1.2 was amended to read as follows:

§ 3A1.2 *Official Victim*
If—
   (a) the victim was a law enforcement or corrections officer; a former law enforcement or corrections officer; an officer or employee included in 18 U.S.C. § 1114; a former officer or employee included in 18 U.S.C. § 1114; or a

member of the immediate family of any of the above, and the offense of conviction was motivated by such status; or
   (b) during the course of the offense or immediate flight therefrom, the defendant or a person for whose conduct the defendant is otherwise accountable, knowing or having reasonable cause to believe that a person was a law enforcement or corrections officer, assaulted such officer in a manner creating substantial risk of serious bodily injury, increase by 3 levels.

original meaning of the pre-amendment guideline.

Further, the United States Sentencing Commission Trainer's Manual for 1989, produced for the Sentencing Commission to assist courts and probation officers in the proper of application of the guidelines, supports our interpretation of the pre-November 1, 1989 version of § 3A1.2. The training section referring to § 3A1.2 provides an example of when this guideline section would properly apply:

> * Example (official victim (§ 3A1.2)): The defendant, in the course of his escape from a bank robbery, shoots and wounds a uniformed police officer. Because the shooting is part of the relevant conduct of the bank robbery offense, the adjustment for official victim would apply.

U.S. Sentencing Commission Guideline Trainer's Manual, Section III(B)(1)(c). This example parallels nearly exactly the situation we have before us, except that the instant case provides stronger factual support for the enhancement. In the example above, the police officer is shot and wounded as the defendant flees the bank. In the instant case, Muhammad, in an attempt to free his co-conspirator in the bank robbery from Officer Stanton's custody, assaults Officer Stanton in a manner likely to bring about serious bodily harm to the officer. Thus, we find the enhancement was proper under the pre-November 1, 1989 version of § 3A1.2.[3]

### C. Double Counting

■ In addition to his independent challenge to the two-level increase under § 2B3.1(b)(3) and the three-level increase under § 3A1.2, Muhammad asserts that the court's assessment of both enhancements constitutes double counting. We find this assertion to be without merit.

As the United States points out, each guideline requires different conduct on the part of the defendant and punishes different wrongdoing. Specifically, § 2B3.1(b)(3) provides for a two-level increase for the defendant's conduct resulting in "bodily injury." Thus, the focus of this enhancement is the fact that the defendant's criminal conduct resulted not only in the offense of conviction, but also in injury to "any victim." U.S.S.G. § 2B3.1(b)(3). By contrast, § 3A1.2 has no requirement of injury at all. Rather, § 3A1.2 adds three levels for crimes motivated by animus against a law enforcement officer, regardless of whether there was injury. U.S.S.G. § 3A1.2 (version effective prior to November 1, 1989).[4] This enhancement is aimed at the punishment of a defendant's acts that put a law enforcement officer at risk of serious bodily harm because of that officer's attempt to do his or her duty. Thus, as these guidelines do not involve offense level adjustments for the same conduct, applying both guidelines does not constitute double-counting.

### V.

■ Finally, Muhammad challenges his sentencing as a career offender under U.S.S.G. § 4B1.1. The sole basis of this contention is that one of the convictions used to determine his career offender status was committed when he was seventeen years old. Section 4B1.1 does not permit an assessment as a career offender unless "the defendant was at least eighteen years old *at the time of the instant offense.*" U.S.S.G. § 4B1.1 (emphasis added). There is no question that Muhammad was not under eighteen at the time of this offense. Nevertheless, Muhammad argues that since the guideline does not treat juveniles as career offenders, it would "violate the spirit" of the guidelines to include an offense committed by a juvenile in the calculation. We disagree.

---

**3.** As we have upheld Muhammad's sentence enhancement under the version of § 3A1.2 in force at the time of the offense, we need not address his arguments as to the implications under the *ex post facto* clause for sentencing him under the amended version of the guideline.

**4.** Even the amended version of this guideline only requires that the assault upon the officer occur "in a manner creating *substantial risk* of serious bodily harm." U.S.S.G. § 3A1.2 (version effective November 1, 1989) (emphasis added).

It is true that the guidelines' definition of "prior felony conviction" for career offender purposes does limit such convictions to "prior adult" convictions. U.S.S.G. § 4B1.2 Commentary, Application Note 3. Although Muhammad was seventeen years old at the time he was first convicted of armed bank robbery in 1974, he was tried and convicted as an "adult" pursuant to 18 U.S.C. §§ 5035 & 5037. Muhammad raises no objection to his trial or conviction as an adult. He merely claims that the fact that he was seventeen at the time of his conviction should bar its use in calculating his career offender status. This novel argument is without precedent. Further, this court and numerous others have repeatedly accepted the use of juvenile convictions in calculating criminal history categories under § 4A1.1. *See, e.g. United States v. Hanley,* 906 F.2d 1116 (6th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 357, 112 L.Ed.2d 321 (1990); *United States v. Unger,* 915 F.2d 759, 764 (1st Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1005, 112 L.Ed.2d 1088 (1991). The fact that Congress did not see fit to treat a juvenile as a career offender, does not mean that this court should ignore a prior adult conviction for bank robbery merely because the defendant was seventeen.

In addition, failure to classify Muhammad as career offender in this case would dramatically understate his criminal history. In 1974, Muhammad was convicted of armed bank robbery and received a sentence of twenty years. While in prison, he stabbed another inmate four times and was subsequently convicted of assault, resulting in an additional sentence of five years consecutive to his armed robbery conviction. He was released from prison in March 1989. He was on parole when he committed the instant bank robbery on June 10, 1989, just three months after having served 15 years in prison. If this is not what Congress meant by a career offender, it is hard to imagine who would qualify. We therefore affirm Muhammad's classification as a career offender.

## VI.

As we find no reversible error committed by the district court either with regard to Muhammad's conviction or his sentence, we AFFIRM.