NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0080n.06

09-3737

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Feb 07, 2011**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| MERLE MONTGOMERY, | ) | SOUTHERN DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellant. | ) | |

Before: DAUGHTREY, CLAY, and WHITE, Circuit Judges.

**PER CURIAM.** Defendant Merle Montgomery pleaded guilty to the offense of manufacturing 100 or more marijuana plants and was sentenced to 60 months in prison, the statutorily-mandated minimum sentence for his offense. He now appeals, contending that his sentence should have been reduced below the 60-month level under the so-called safety-valve provisions of United States Sentencing Guidelines § 5C1.2 and 18 U.S.C. § 3553(f). We find no reversible error in connection with the district court's sentencing order and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Represented by counsel, Montgomery entered into an agreement with the government, pursuant to which he pleaded guilty to "unlawfully manufacturing 100 plants

or more of marijuana, a Schedule I controlled substance, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(vii) and 18 U.S.C. § 2." In the plea agreement, the defendant acknowledged that he was subject to a potential mandatory-minimum sentence of five years in prison. He also acknowledged that the government considered him ineligible for a sentence reduction pursuant to the safety-valve provisions of USSG § 5C1.2. Nevertheless, "[t]he defendant reserve[d] the right to contest [that] position at the time of sentencing."

During the sentencing hearing, Montgomery testified that he started the marijuana grow operation in a detached basement of his home in an effort to raise money to defray expenses incurred after he became too disabled to work. According to the defendant, however, only he was involved in the criminal activity. To his knowledge, he swore, no other family members were even aware of the existence of the grow operation, and only he possessed a key to unlock the four padlocks that secured the sole entranceway to the basement. He testified further that he set up the entire operation by himself without assistance from anyone, and that an inoperable pistol and an unloaded shotgun found in the bedroom of his home were not used in the grow operation or maintained to protect the assets of the endeavor. Rather, Montgomery explained, he had purchased the pistol years earlier for his wife to have while he was away from home driving trucks for a living, and the shotgun, a birthday present from his wife, was used only to hunt deer and rabbits. Montgomery said that the shotgun was kept unloaded and had not been fired in almost 20 years.

Likewise, Montgomery's wife and two adult daughters testified at the hearing that they were not involved in, and had no knowledge of, the grow operation in the basement of the home in which they lived, although his daughters did admit that they had, at times, detected a smell like growing marijuana around the premises. These family members also corroborated the fact that the pistol and handgun had been in the house for years, that the shotgun had not been fired by anyone for as long they could remember, and that the pistol was fired only for demonstration purposes shortly after the defendant gave it to his wife.

Additional testimony at the sentencing hearing offered by prosecution witnesses described the layout of the operation, which was described as "a fairly elaborate setup." This testimony suggested that Montgomery had at least one partner in the grow operation. In fact, the defendant did not contest the fact that he obtained carbon dioxide and carbon-dioxide canisters utilized in the cultivation of the marijuana plants from a nearby company that sold welding supplies and industrial gases. Furthermore, he conceded that those products were purchased on an account opened by his son, David Montgomery, near the time when the grow operation began. Even though the account was opened in the name of David Montgomery, a salesperson from the company testified that another, older individual, later identified as the defendant, often visited the business, purchased the canisters of carbon dioxide, and typically signed for the purchases using the name "David Montgomery."

That salesperson also testified that an empty canister weighs approximately 100 pounds and that a canister filled with carbon dioxide could weigh as much as 150 pounds. Nevertheless, the defendant insisted that he received no assistance from anyone in transporting the canisters from his truck into the basement grow area; rather, he "just backed the truck up to the [basement] door and let it slide off." When discussing the grow operation that had been conducted on the defendant's property with law enforcement officials, however, the defendant's son, David Montgomery, commented that "we had started that after dad had got sick," thus intimating that the defendant did not act alone, but oversaw an effort involving at least himself and his son.

Based upon the testimony presented at the sentencing hearing, the district judge concluded that the defendant did not qualify for a safety-valve reduction in his sentence because Montgomery did indeed serve as an organizer, leader, manager, or supervisor of others during the offense. More specifically, the district judge explained:

> I think that his son – well, the evidence is clear that his son was involved in the crime. . . . David Montgomery opened the account. He came in on occasion to purchase the cylinders. . . . So I think that based on that testimony, I will infer that Mr. Montgomery had involvement.
>
> It's clear to me that Mr. Montgomery orchestrated this crime. He was clearly the person who organized it, if I believe his testimony. He went out and he bought the seeds. He came back, he planted it, he studied as to how to grow it and he grew it.
>
> But the other thing that I find totally implausible is that everyone in the family lived in that house with a locked basement, never went down in the basement, smelled marijuana but never went down in the basement to see what was happening.

> I think that when the evidence is viewed in its totality, I agree with the arguments advanced by the government in its papers that there were others involved. Mr. Montgomery may have been the organizer or leader, but he was working with the assistance of others. Certainly he had – I mean, just on the face of it, he enlisted his son to assist him. His son opened the account . . . on the basis of which the defendant purchased $CO_2$ canisters that he used in his grow operation. The deed of the residence was placed in the daughter's name. The house was obviously used as part of the grow operation. So I think that he was – he did have a supervisory role in this crime . . . .

> Then, with respect to truthful information, to the extent that Mr. Montgomery said that he was the only one involved in this scheme – he persisted he was the only one, he persists in his position that no one ever went into the basement, no one ever assisted him in this scheme. To that extent, he was not truthful with the government . . . .

## DISCUSSION

On appeal, Montgomery does not challenge his conviction for the manufacture of more than 100 marijuana plants. Nor does he contest the provisions of 21 U.S.C. § 841(b)(1)(B)(vii) mandating that a sentence for such an offense "not be less than 5 years and not more than 40 years." He does maintain, however, that he has satisfied the requirements for reduction of the five-year minimum sentence through application of USSG § 5C1.2, the safety-valve provision.

We have long recognized that we review "the district court's application of the sentencing guidelines *de novo* and its supporting factual findings for clear error." *United States v. Kellams*, 26 F.3d 646, 648 (6th Cir. 1994) (citing *United States v. Muhammad*, 948 F.2d 1449, 1455 (6th Cir. 1991)). As we noted in *Kellams*, such "'[c]lear error' occurs

09-3737
United States v. Montgomery

only when we are left with the definite and firm conviction that a mistake has been committed." *Id.* (citing *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)). Consequently, "[i]f there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* (citing *Anderson*, 470 U.S. at 574).

Despite the seemingly mandatory nature of the five-year minimum sentence mentioned in 21 U.S.C. § 841(b)(1)(B)(vii), section 5C1.2(a) of the sentencing guidelines permits a district court to impose instead a guideline sentence "if the court finds that the defendant meets the criteria in 18 U.S.C. § 3553(f)(1)-(5)," as follows:

> (1) the defendant does not have more than 1 criminal history point . . .;
>
> (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
>
> (3) the offense did not result in death or serious bodily injury to any person;
>
> (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines . . .; and
>
> (5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

USSG § 5C1.2(a)(1)-(5) (2008).

In this case, the parties do not dispute that Montgomery, age 63 at the time of sentencing, had zero criminal history points, *see* USSG § 5C1.2(a)(1) (2008), and that the offense of conviction did not result in death or serious bodily injury to any person, *see* USSG § 5C1.2(a)(3) (2008). At issue is the applicability of two of the five safety-valve criteria – whether defendant Montgomery was an organizer, leader, manager, or supervisor of others in the offense, *see* USSG § 5C1.2(a)(4) (2008), and whether Montgomery truthfully provided to the government all information pertinent to the grow operation, *see* USSG § 5C1.2(a)(5) (2008).[1] In reality, however, these two considerations have become conflated here, because the district court's finding that Montgomery did not truthfully provide "all information" to the government is based solely upon its determination that the defendant failed to admit that he was an organizer, leader, manager, or supervisor of criminal activity that involved individuals other than himself.

Pursuant to the provisions of 18 U.S.C. § 3553(f)(4) and USSG § 5C1.2(a)(4) (2008), resolution of a dispute over a defendant's status as an organizer, leader, manager, or supervisor of others in an offense requires a court to determine whether the defendant would receive "an adjustment for an aggravating role under § 3B1.1" of the guidelines. *See* USSG § 5C1.2, comment. (n.5) (2008). "To qualify for an adjustment under [that]

---

[1]In light of our decision to otherwise uphold the district court, we decline to revisit the court's finding that the pistol and shotgun found in the Montgomery home were not possessed "in connection with the offense" of conviction. *See* USSG § 5C1.2(a)(2) (2008).

section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." USSG § 3B1.1, comment. (n.2) (2008).

Whether the defendant in this case exercised the decision-making authority of an organizer, leader, manager, or supervisor is not at issue. Montgomery himself admits that he devised and operated the entire marijuana-manufacturing process that was carried out in his basement. Rather, the dispute revolves around a determination whether any *other* individual was also involved in the grow operation and thus was subject to Montgomery's directives.

As noted previously, the defendant denied the government's contention that other members of his immediate family assisted him in illegal activity. Indeed, he maintained that no one else even knew of the operation being run from his padlocked basement. However, the district judge was in a position to observe the witnesses at the sentencing hearing and to make credibility determinations. From that vantage point, he discredited Montgomery's assertion that he had acted alone and gave credence to other testimony indicating that family members were indeed involved in the grow operation.

Specifically, the record establishes that David Montgomery, the defendant's son, opened the account from which both he and the defendant purchased carbon dioxide used in the marijuana-growing process. Also, upon hearing of the raid at his father's property, David volunteered the statement to law-enforcement authorities that "we had started [the grow operation] after dad had got sick." Such an admission of joint action, in conjunction

with the defendant's sworn testimony that he himself was in charge of the running of the operation, is sufficient to support the conclusion that the defendant and his son were working together, under the father's direction, to violate controlled-substance laws. Moreover, David conceded that marijuana found in his residence had come from his father's basement.

In addition, there was testimony that although the residence was owned by Montgomery and his wife, the title to the house had been put in the name of the Montgomery's daughter, Christie Leeann Montgomery, who was living at her parent's home with her 11-year-old daughter at the time the search warrant was executed. And, although she had lived there for some three years and had title to the house, she professed to know nothing about the basement or what was in it, swore that she had never asked about it, and testified that she had no idea who had the keys to the four padlocks that were kept on the basement door. Her sister Ella, also a resident, and the Montgomery's wife gave similar testimony. Although the likelihood that Montgomery's wife and daughters were aware or suspicious of Montgomery's illegal activities does not make them participants in the offense, their assertions do reflect on their own and Montgomery's credibility.

It is clear from the district court's comments that the credibility of Montgomery and his witnesses was subject to grave doubt. Under well-settled precedent, we are bound by the district court's credibility determintions, an issue that "is generally beyond the scope of [appellate] review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995); *see also United States v.*

*Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993) ("In addressing sufficiency of the evidence, this Court has long recognized that we do not weigh the evidence, consider the credibility of witnesses or substitute our judgment for that of the [fact-finder].")

## **CONCLUSION**

For the reasons set out above, we AFFIRM the district court's judgment.